IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REGINALD T. SMITH, | No. C 04-4743 WHA (PR) |
| Petitioner, | **DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |
| vs. | |
| A. DUNCAN, Warden, | |

This is a habeas corpus case filed by a state prisoner pursuant to 28 U.S.C. 2254.  The court ordered respondent to show cause why the writ should not be granted.  Respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged exhibits with the court.  Petitioner has not filed a traverse.  For the reasons set forth below the petition is **DENIED**.

## STATEMENT

A jury convicted petitioner of murder with the special circumstance that it was committed in the course of a rape.  He was sentenced to life without the possibility of parole.  His conviction was affirmed on direct appeal by the California Court of Appeal and the California Supreme Court denied review.  The state appellate courts also denied a state habeas petition which was filed simultaneously with the direct appeal.  As grounds for habeas relief he asserts that: (1) counsel was ineffective in failing to present crucial defense witnesses; (2) the refusal to unseal certain material on appeal denied petitioner due process; (3) counsel was ineffective in failing to challenge the seizure of key evidence; (4) his due process rights were violated by exclusion of evidence of a third party's culpability; (5) counsel was ineffective in failing to investigate and call witnesses; (6) counsel was ineffective on several other specified

grounds; (7) counsel was ineffective in failing to request certain jury instructions; and (8) his due process rights were violated when the jury allegedly was misinstructed on the standard of proof.

The following facts are taken from the opinion of the California Court of Appeal:

> On the morning of February 25, 1998, Officer Flecklin responded to a call for medical assistance at 1010 Center Street in Oakland. Officer Flecklin interviewed J. S., a four-year-old boy, who was at the scene. J.S. told Flecklin that he watched television with his mother the previous evening before falling asleep. When he awoke in the morning, he was thinking about watching cartoons but found that the television set was missing. He found his mother, Kyla Thomas, in the bathroom and tried to wake her up but she was unresponsive. Charlene Young, Thomas's friend, then called. J.S. told her about his mother and Young called 911.
>
> Flecklin found Kyla Thomas lying on her bathroom floor wearing a pajama top that was open exposing her chest. Thomas's pajama bottoms were down, with one pant leg around the ankle. An evidence technician subsequently found several buttons that matched in the bathroom. Two buttons were found underneath Thomas, one was found in the bathtub and another was located on the floor. Several fingerprints were also found at the scene including seven in close proximity to Thomas's body.
>
> Flecklin found no signs of forced entry. He did, however, find signs of drug use and drug paraphernalia in the bathroom.
>
> The autopsy revealed that Thomas died of manual strangulation. The medical examiner found dried semen on Thomas's inner thighs and in her pubic region and bruises on her legs. The semen had dried within minutes and in such a manner to suggest that Thomas was lying on her back during the sexual intercourse. The examiner found no signs of trauma to Thomas's vagina but this did not preclude a finding of rape. A sample of Thomas's blood tested positive for cocaine. The medical examiner determined that the cocaine was most likely ingested within six hours of her death.
>
> Sergeant Haney was the investigating officer. He responded to the scene and observed Thomas lying on the bathroom floor. Based on the evidence at the scene including the location of the semen on Thomas's thighs that suggested she had not moved, Haney opined that whoever had sex with Thomas killed her.
>
> In the course of his investigation, Haney learned that Thomas had been involved in a romantic relationship with Young. Young purchased a television set for Thomas and gave it to her in 1997. It was the same television set that was missing from the apartment on the morning following the murder. Haney also determined that Elmore Briggs, Ronnie Powell, Michael Willis, and Brian Brice were associated with the victim and were possible suspects in the case. In searching Thomas's apartment, Haney found documents belonging to Powell.
>
> Haney interviewed J. S., the victim's son, on March 16, 1998, and June 18, 1998. J.S. identified Willis as a man he saw his mother struggling with on the evening before the murder. J.S. saw Thomas stab Willis in the leg with a kitchen knife. Haney testified that his impression of J.S. was that he was going though trauma, grief and "[t]here was the issue of him possibly being recently sexually

2

molested." Haney subsequently interviewed Willis who admitted that he was at Thomas's apartment the evening before the murder. Willis's fingerprints were not found at the scene.

On March 13, 1998, Young told Haney that "Anthony" who was dating Erica Jones, who lived about a block away from Thomas's apartment, might know something about the television. On March 23, 1998, Young told Haney that Jones's boyfriend's correct name was Reggie. Haney subsequently determined that Reggie's last name was Smith. Through further investigation, Haney located defendant in the Santa Rita county jail.

On April 28, 1998, Haney interviewed defendant. Defendant admitted that he had a prior relationship with Jones who lived at 1448 11th Street and that he knew Thomas. He had heard about Thomas's murder on the street. He told Haney that he saw Thomas on February 24, 1998, the evening before she was murdered. He said that he walked by her apartment and saw her at the front window. Thomas spoke to him through the window and asked for either a flight [FN1. A flight is a hit off a cocaine base pipe.] or a cigarette. Defendant did not give anything to Thomas. He told Haney that he had never had sex with Thomas and that he did not know the whereabouts of her television.

Haney subsequently learned that semen was recovered from Thomas's body. DNA (deoxyribonucleic acid) testing eliminated Briggs and Powell as possible donors of the semen. Haney thereafter sought samples from defendant and Willis, another possible suspect. Based on DNA testing, defendant could not be excluded as the donor of the semen found on Thomas's body.

Haney also learned that several fingerprint lifts from the crime scene belonged to defendant. Seven of defendant's prints were located about 9 inches apart approximately 10 to 16 inches from Thomas's throat in the position she was found on the bathroom floor.

Pamela Sartori, a criminalist for the Oakland Police Department, testified as an expert in DNA analysis. Using the polymerase chain reaction (PCR) DNA testing system, she opined that defendant's DNA profile matched that of the semen found on the victim. She further testified that the frequency of that DNA profile occurs in one in 16,500 African-Americans and in one in 20,000 Caucasians. Sartori also testified that short tandem repeats, a new technology for conducting DNA tests that could narrow the probability of finding a match of a DNA profile to one in a million or one in a trillion, was now available. She noted that in this case there was sufficient semen evidence available for retesting of DNA.

In defense, defendant sought to show that others could have committed the murder. In particular, the defense attempted to demonstrate that Powell, whose palm print was found over the toilet at the scene, or Willis, who argued with Thomas on the evening before the murder, was the perpetrator. [FN2. The defense called Powell as a witness. Out of the presence of the jury, Powell invoked his privilege against self-incrimination.] In closing argument, defense counsel argued that the police had not checked to see whether Willis's DNA excluded him as a suspect.

3

(Exh. 12)[1]

**DISCUSSION**

**A.   STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falls under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *See id.* at 409.

"Factual determinations by state courts are presumed correct absent clear and

---

[1] Citations to "Exh." are to the exhibits lodged with the court by the Attorney General.

4

convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340. This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001). A petitioner must present clear and convincing evidence to overcome § 2254(e)(1)'s presumption of correctness; conclusory assertions will not do. *Id.*

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir.2000).

**B.    ISSUES PRESENTED**

    **1. INEFFECTIVE ASSISTANCE OF COUNSEL ISSUES**

        **a. STANDARD**

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must show: first, that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. *Ibid.* Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689. A difference of opinion as to trial tactics does not constitute denial of effective assistance. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better

tactics are known to have been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984).

///

### b. FAILURE TO INVESTIGATE AND PRESENT WITNESSES

Petitioner contends that counsel was ineffective in not investigating potential witnesses and presenting their testimony. He asserts that counsel could have made a better showing that Ronnie Powell, the victim's boyfriend, was the killer, by locating, interviewing, and calling as witnesses Powell's fiancé Teresa Cole, who could testify to violent acts by Powell; Babette Dixon, who told a police officer that the victim had said she was going throw Powell out; Ladonna Cook, who supposedly told Charelene Young that Cook had heard Powell arguing with the victim the night of the murder; Shaymore Caldwell, who told an officer that Powell had been the last person to go to the victim's apartment that night; Teresa Rubio, who had seen someone called Elmo Briggs in the hall the day after the murder; and Elmo Briggs, who had been with petitioner the day after the murder and who could testify that he had asked petitioner when he had gotten out of "there" and that petitioner responded "early" (Pet., attached Pet. for Review at 25-26).

The California Court of Appeal held as a matter of California law that the above testimony, if proffered, would not have been enough to allow petitioner to present evidence of third-party culpability (that is, that Powell was the killer) (Exh. 12 at 27). The court of appeal also held as a matter of California law that the evidence would have been excluded as resulting in "undue delay, prejudice, or confusion of issues" (*ibid.*). The court noted that petitioner had failed to provide any evidence that the witnesses could actually have been produced, and held that for these reasons petitioner had failed to establish that counsel was incompetent (*ibid.*).

To establish prejudice caused by the failure to call a witness, a petitioner must show that the witness was likely to have been available to testify, that the witness would have given the proffered testimony, and that the witnesses' testimony created a reasonable probability that the jury would have reached a verdict more favorable to the petitioner. *Alcala v. Woodford*, 334 F.3d 862, 889-90 (9th Cir. 2003). Not only has petitioner failed to show that the proposed

1    witnesses would have been available to testify, but the holding of the court of appeal that under
2    California law the evidence would not have been admissible, which is binding here, *see*
3    *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005), means that the failure to investigate and call the
4    witnesses could not have been prejudicial. Petitioner's Sixth Amendment right to effective
5    counsel was not violated.

### c.   FAILURE TO CHALLENGE SEIZURE OF KEY EVIDENCE

7    Petitioner contends that counsel was ineffective in failing to challenge the seizure of his
8    blood by moving to disclose the confidential informant who provided the information for the
9    warrant, to unseal the affidavit, and to suppress the results of the tests. The court of appeal held
10   that under California law the affidavit would not have been unsealed (Exh. 12 at 23). Given
11   that the putative motion to unseal the affidavit would have failed under California law, which
12   holding is binding on this Court, petitioner was not prejudiced by counsel's failure to move to
13   unseal and suppress.

### d.   FAILURE TO REQUEST JURY INSTRUCTIONS

15   Petitioner contends that his counsel was ineffective in not requesting a jury instruction
16   on reasonable belief in consent to intercourse based on equivocal behavior; not asking for an
17   instruction defining "specific intent to rape;" and not asking that the second-degree murder
18   instruction be modified to fit the circumstances of this case. The court of appeal held as a
19   matter of California law that these instructions were not warranted (Exh. 12 at 15-17), so
20   counsel's failure to ask for them, when they would not have been given, was not ineffective
21   (Exh. 12 at 27).

22   Because requests by counsel for the instructions would not have succeeded, counsel was
23   not ineffective in failing to take the futile action of asking for them. *See Juan H. v. Allen*, 408
24   F.3d 1262, 1273 (9th Cir. 2005) (trial counsel cannot have been ineffective for failing to raise a
25   meritless argument).

### e.   MISCELLANEOUS GROUNDS

27   The victim's four-year old son told police that on the night of the murder he heard
28   Michael Willis whisper that he was going to kill the victim (Exh. 12 at 24). The court of appeal

7

noted that the statement was hearsay; that petitioner was not prejudiced because evidence was introduced at trial that the victim and Willis had a fight the night of the murder and that the victim stabbed Willis in the leg; and that the proposed evidence would not have created a reasonable probability that the result would have been different because it would have done nothing to explain the DNA evidence and petitioner's fingerprints (*ibid.*). For the reasons pointed out by the court of appeal, counsel was not ineffective in failing to attempt to introduce the child's statement.

Petitioner also contends that counsel was ineffective in failing to object to (1) two hearsay statements by Charlene Young and (2) evidence revealing that he was incarcerated.

The hearsay was a statement to an officer by the victim's friend Charlene Young that petitioner might "know something" about the missing television set, and the officer's testimony that Young told him she had received a threat for "asking too many questions...." (*id*. at 12). The court of appeal held that because admission of the evidence was harmless, it was not ineffective for counsel to fail to object (*ibid*. at 12-13, 26).

The hearsay statement about the televison set was, as the court of appeal noted, not the evidence that linked petitioner to the murder – it was DNA and his fingerprints that did that. And the evidence that Young was threatened was not tied to petitioner. Given the other evidence, set out in the statement of the facts above, counsel's failure to object to the admission of these hearsay statements was not prejudicial.

The evidence that petitioner's hair and blood samples were taken at San Quentin was objected to by counsel, but the objection was overruled on grounds it should have been raised in a motion in limine (Exh. 12 at 13-14). Petitioner's booking photo and evidence that he was questioned by a police officer at the Santa Rita jail were admitted over objection (*id.* at 14-15). The trial court gave an instruction informing the jury that it was not to consider the evidence that petitioner was in custody "for any purpose" (*id.* at 14). The court of appeal held that the erroneous admission of the evidence was harmless in face of the overwhelming evidence – "DNA and fingerprints" – that petitioner was guilty (*id.* at 15).

Counsel's failure to file a motion in limine as to this evidence was not prejudicial for the

8

1  reasons identified by the court of appeal. Petitioner's right to effective assistance of counsel
2  therefore was not violated in these instances.
3  ///
4  Petitioner also contends that counsel was ineffective in failing to impeach the
5  investigating officer with his prior statement contradicting his testimony that he believed the
6  sex act and the murder were linked. The statements were from warrant affidavits, whereas the
7  officer's trial testimony was about his conclusions as a result of his investigation. The prior
8  statements therefore were not impeaching. Counsel was not ineffective on this ground.
9  Petitioner contends that counsel was ineffective in failing to object to the DNA evidence
10 on grounds that DNA testimony breaking down probabilities by race is improper (Pet., attached
11 Pet. for Review at 29-30). The court of appeals held that petitioner was not prejudiced by the
12 witness's testimony as to the probability of a match in the African-American and white
13 populations, because the testimony tended to favor him by implying that the possibility of error
14 was higher than it would have been with a non-racial database (Exh. 12 at 29-30). For the
15 reasons set out by the court of appeal, counsel's failure to make this particular objection was not
16 prejudicial.
17 Petitioner also contends that counsel was ineffective in elicited on cross-examination of
18 the investigating officer he fact that another suspect had given him petitioner's name as
19 someone who the informant thought might be involved in the murder.  The Court agrees with
20 the court of appeal that this minor misstep could not have been prejudicial. In addition, it is
21 apparent from the questioning that counsel was attempting to emphasize that there were other
22 suspects (RT 444-45). The questioning thus was not incompetent lawyering.
23 Petitioner also contends that counsel was ineffective in failing to object to purported
24 prosecutorial misconduct in closing argument. The court of appeal noted that it had held in the
25 direct appeal portion of the opinion that there was no prosecutorial misconduct, so counsel's
26 failure to object could not have been incompetence, and also held that counsel's statement that
27 his policy was not to object in closing unless the prosecutor's offense was extreme showed a
28 tactical reason for the lack of objection (Exh. 12 at 26-27). This conclusion is correct. *See*

9

*United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981) (difference of opinion as to trial tactics does not constitute denial of effective assistance).

///

### 2. EXCLUSION OF EVIDENCE OF THIRD-PARTY CULPABILITY

Petitioner contends that the trial court violated his due process and Confrontation Clause rights by not allowing him to introduce a tape of a pretrial statement made by the victim's live-in boyfriend, Ronnie Powell (Exh. 12 at 5). Powell invoked his Fifth Amendment right not to testify, and petitioner contended that the statement was admissible as an admission against penal interest (*ibid.*). The court of appeal held that exclusion of the statement was proper under state hearsay rules because Powell's answers were descriptions of his sarcastic response to other persons' suggestions that maybe he killed the victim – "Yeah, RIGHT, sarcastically" (*id.* at 6-7). The comments thus were not in fact against penal interest, as they were not really admissions that he killed the victim, which Powell made clear in the statement itself (*id.* at 7). The court of appeal also held that exclusion of the statement did not violate petitioner's constitutional rights because the statement was not probative on the defense that a third person committed the crime (*id.* at 8).

Exclusion of evidence may violate a defendant's constitutional rights even if the exclusion is proper under state evidentiary rules. *Murdoch v. Castro*, 365 F.3d 699, 702 (9th Cir. 2004). In *Chambers v. Mississippi*, 410 U.S. 284 (1973), the Supreme Court held that the defendant was denied a fair trial when the state's evidentiary rules prevented him from calling other witnesses who would have testified that the first witness made inculpatory statements on the night of the crime. Similarly, in *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986), the Court held that the defendant's right to have a fair opportunity to present a defense, whether rooted in the Fourteenth Amendment's Due Process Clause or in the Sixth Amendment's confrontation or compulsory process clauses, is violated by a trial court's exclusion of competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. *See also Rock v. Arkansas*, 483 U.S. 44, 56-62 (1987) (holding unconstitutional Arkansas per se rule excluding all hypnotically enhanced testimony). The

1  Ninth Circuit has summarized the rule as "states may not impede a defendants's right to put on a
2  defense by imposing mechanistic (*Chambers*) or arbitrary (*Rock*) rules of evidence." *LaGrand*
3  *v. Stewart*, 133 F.3d 1253, 1266 (9th Cir. 1998). The rule is clearly established federal law
4  under 28 U.S.C. § 2254(d) and a proper basis for federal habeas relief. *See, e.g.*, *Greene v.*
5  *Lambert*, 288 F.3d 1081, 1093 (9th Cir. 2002)

6  The right to present a defense is not absolute, however. *See Taylor v. Illinois*, 484 U.S.
7  400, 410 (1988). The accused's compulsory process rights may be limited by evidentiary rules,
8  *see Perry v. Rushen*, 713 F.2d 1447, 1453-54 (9th Cir. 1983) (no violation of compulsory
9  process to prohibit evidence of third party identity because evidence collateral and state interest
10 in evidentiary rule overriding), and by the state's legitimate interest in efficient trials, *see United*
11 *States v. King*, 762 F.2d 232, 235 (2d Cir. 1985) (no compulsory process clause violation when
12 trial court denied motion for continuance to permit defense witness to testify because defendant
13 made neither timely request for witness production nor "eleventh hour" request on expedited
14 basis). Nor does the Due Process Clause guarantee the right to introduce *all* relevant evidence
15 to present a defense. *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996). The exclusion of evidence
16 does not violate the Due Process Clause unless "'it offends some principle of justice so rooted
17 in the traditions and conscience of our people as to be ranked as fundamental.'" *Id.* at 43
18 (quoting *Patterson v. New York*, 432 U.S. 197, 201-02 (1977)).

19 The question, then, is whether the exclusion here was "mechanistic" or "arbitrary." *See*
20 *LaGrand*, 133 F.3d at 1266 (summarizing Supreme Court cases). In this case the court
21 examined the content of the statement and concluded that Powell's joking remarks about his
22 guilt were not probative. There is nothing mechanistic or arbitrary about that – and it is correct.
23 Petitioner's rights were not violated.

24 **3.  REFUSAL TO UNSEAL SEARCH WARRANT AFFIDAVIT**

25 Petitioner contends that his due process rights were violated by the California Court of
26 Appeal when it denied his motion to unseal the affidavit supporting a search warrant request for
27 his blood.

28 The Constitution does not require states to grant appeals as of right to criminal

11

1 defendants seeking to review alleged trial court errors, but if a state creates a system for
2 appellate review, the procedures must comport with the demands of constitutional due process.
3 *Evitts v. Lucey*, 469 U.S. 387, 393 (1985).

4 It is thus clear that petitioner does have a right to due process on appeal. But a federal
5 court can grant a writ of habeas corpus only if the decision of the state court was contrary to, or
6 an unreasonable application of, clearly-established United States Supreme Court authority. 28
7 U.S.C. § 2254(d). Petitioner cites no clearly-established United States Supreme Court authority
8 holding that due process imposes specific obligations on state appellate courts as to the record
9 they consider, and the Court has found none, so the decision of the California Court of Appeal
10 declining to unseal the affidavit cannot have been contrary to or an unreasonable application of
11 clearly-established Supreme Court authority. *See Carey v. Musladin*, 127 S. Ct. 649, 654
12 (2006) (lack of clearly-established Supreme Court authority fatal to habeas claim).

### 4. STANDARD OF PROOF

14 The trial court gave the standard California jury instruction on burden of proof, CALJIC
15 2.90. Petitioner contends that giving it violated due process because of the use of "until" in the
16 phrase "presumed innocent until the contrary is proven" rather than "unless" (Pet., attached Pet.
17 for Review at 38).

18 The beyond a reasonable doubt standard is a requirement of due process, but the
19 Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to
20 do so as a matter of course. *See Victor v. Nebraska*, 511 U.S. 1, 6 (1994). So long as trial court
21 instructs the jury on the necessity that defendant's guilt be proven beyond a reasonable doubt,
22 the Constitution does not require that any particular form of words be used in advising the jury
23 of the government's burden of proof. *See id.* The version of CALJIC 2.90 given here was
24 upheld in *Lisenbee v. Henry*, 166 F.3d 997, 999-1000 (9th Cir. 1999). The instruction did not
25 violate petitioner's rights.

26 Petitioner also contends that the prosecutor committed misconduct by arguing in rebuttal
27 closing argument that the presumption of innocence no longer applied (Exh. 12 at 18). The
28 court of appeal concluded that the argument was essentially a contention that the People had

12

met their burden of proof and so was not misconduct (*id.* at 18-19).  A defendant's due process rights are violated only if a prosecutor's misconduct renders a trial "fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  The jury was given the standard "beyond a reasonable doubt" instruction, and the parties reminded the jurors of that burden in their arguments (Exh. 12 at 19).  In light of this, the prosecutor's statement was not sufficient to render the trial fundamentally unfair.  Petitioner's due process rights were not violated.

## CONCLUSION

The rejection of petitioner's claims by the state appellate courts was not contrary to, or an unreasonable application of, clearly-established Supreme Court authority.  The petition for a writ of habeas corpus is **DENIED**.  The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: March     31    , 2008.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

G:\PRO-SE\WHA\HC.04\SMITH,R743.RUL.wpd